# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE, AT KNOXVILLE

DIXIE KIM CANTEY and
JOHN CANTEY

    *Plaintiffs*,

v.

ALPINE EAST, LLC and
WIEGAND SPORTS GmbH,

    *Defendants*.

No. _____

**JURY DEMANDED**

## COMPLAINT

Come the Plaintiffs, Dixie Kim Cantey, and John Cantey, by and through counsel, and for cause of action against the Defendants, aver as follows:

1. Plaintiff, Dixie Kim Cantey ("Mrs. Cantey") and Plaintiff, John Cantey ("Mr. Cantey"), reside in Fitzpatrick, Alabama and are citizens of Alabama for purposes of diversity jurisdiction.

2. The Defendant, Wiegand Sports GmbH is registered in Montana as Wiegand Sports GmbH LLC as successor in interest to and assignee of Wiegand Sports, LLC, a Utah limited liability company ("Wiegand") and may be served through their registered agent, Melanie Bengtson, 2620 Connery Way, Missoula, MT 59808.

3. Upon information and belief, none of the LLC members of Wiegand are residents of the state of Alabama.

4. The Defendant, Alpine East, LLC ("Alpine"), is a limited liability company formed under the laws of the State of Tennessee with its principal office at 1341 Wears Valley Road, Pigeon Forge,

TN 37863-7713. Defendant Alpine is a citizen of Tennessee for purposes of diversity jurisdiction. For purposes of this action, Defendant Alpine may be served through its registered agent, Ross Ogle.

5. Upon information and belief, none of the LLC members of Alpine are residents of the state of Alabama.

6. The amount in controversy in this civil action exceeds $75,000, exclusive of interest and costs.

7. There is complete diversity of citizenship between the parties.

8. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

9. A substantial part of the events or omissions giving rise to this claim occurred in Sevier County, Tennessee. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391.

10. Defendant Alpine owns, operates, maintains and has exclusive control of a mountain coaster called Goats on the Roof of the Smokies on its property in Pigeon Forge, Tennessee.

11. Defendant Alpine is the "operator" of Goats on the Roof of the Smokies, as that term is used in Tenn. Code Ann. § 68-121-101(14).

12. Defendant Alpine is the "owner" of Goats on the Roof of the Smokies, as that term is used in Tenn. Code Ann. § 68-121-101(15).

13. Goats on the Roof of the Smokies qualifies as an "amusement device," as that term is used in Tenn. Code Ann. § 68-121-101(3).

14. On or around November 22, 2021, Mrs. Cantey was an invitee of Defendant Alpine and Defendant Alpine charged her money and thereafter allowed her to ride Goats on the Roof of the Smokies coaster.

15. During the ride Mrs. Cantey was severely injured as a result of the acts and omissions by these Defendants complained of herein.

16. Upon information and belief, Defendant Alpine owned the property on which Goats on the Roof of the Smokies is situated, located at 1341 Wears Valley Road, Pigeon Forge, Tennessee during the time of the incident described herein.

17. In the alternative, if Defendant Alpine did not own the Alpine coaster at the time of the incident described herein, Alpine operated and maintained such coaster at all material times.

18. Mrs. Cantey decided to ride on the Goats on the Roof coaster, a mountain coaster that has individual coaster carts which travel on a track of tubular steel rails at a speed of up to 30 miles per hour.

19. Mrs. Cantey met all the requirements of Goats on the Roof of the Smokies and abided by all of the safety restrictions for the ride including, but not limited to, buckling and keeping the seatbelt secure until the ride stops.

20. Riders of the Goats on the Roof of the Smokies coasters have no control over the steering of the coaster carts.

21. At the beginning of the ride, the Coaster Carts are pulled to the top of the track by a cable or other mechanical mechanism. Once at or near the top of the track, the coaster carts are released at the discretion of Alpine employees and propelled downward by gravity.

22. As Mrs. Cantey neared completion of the ride, and approached the exit area, her cart was suddenly slammed from behind by another cart at a high rate of speed.

23. Employees of Alpine were immediately aware of the crash and spoke with Mr. and Mrs. Cantey. Such employees were advised that Mrs. Cantey suffered injuries. No medical attention was offered.

24. Employees of Alpine stated that the carts were not supposed to be able to impact each other and that this was computer operated. Such employees told Mr. and Mrs. Cantey that the computer

3

failed.

25. The Defendants herein were aware, prior to the collision at issue, that collisions between carts may reasonably be expected to occur if normal stopping controls fail or are not used.

26. Upon information and belief, the cart in which Mrs. Cantey was riding is designed/manufactured to automatically slow down and/or stop near the unloading area and are supposed to have a system that prevents the carts from impacting another.

27. Plaintiffs aver that emergency brakes or other equally effective stopping controls were required for the Goats on the Roof of the Smokies coaster pursuant to Tenn. Comp. R. & Regs. 0800-03-04-.19(1).

28. The Goats on the Roof of the Smokies coaster was required to be equipped with an adequate emergency braking or other equally effective stopping system in accordance with Tenn. Comp. R. & Regs. 0800-03-04-.19(1). If it is shown that the Goats on the Roof of the Smokies coaster was equipped with such a braking or stopping system, the same obviously failed to function as designed in Mrs. Cantey's case and such failure constitutes an unreasonably dangerous and defective aspect of the mountain coaster.

29. Upon information and belief, Mrs. Cantey's cart was released to travel down the track with insufficient time for the cart to complete the ride course before another patron's cart was released.

30. Mrs. Cantey suffered injuries to her back, neck and chest. She has had significant medical care including, but not limited to, spine treatment. Mrs. Cantey is still undergoing medical treatment.

31. The collision Mrs. Cantey was involved in on November 22, 2021, qualifies as a "serious incident," as that term is used in Tenn. Code Ann. § 68-121-101(20).

32. Upon information and belief, the Goats on the Roof of the Smokies coaster did not cease to operate following Mrs. Cantey's collision on November 22, 2021.

33. Upon information and belief, Defendant Alpine did not report Mrs. Cantey's collision to the Commissioner of Labor and Workforce Development, in writing, within twenty-four (24) hours.

34. Upon information and belief, following Mrs. Cantey's collision, Defendant Alpine did not contact a qualified inspector to conduct an inspection on the Goats on the Roof of the Smokies coaster.

35. Upon information and belief, there was not a cessation in operation of Goats on the Roof of the Smokies following Mrs. Cantey's collision until after an inspection was performed by a qualified inspector.

36. Upon information and belief, the coaster carts involved in Mrs. Cantey's collision were not removed and quarantined following Mrs. Cantey's collision.

37. Based on Defendant Alpine's failure to cease operations, failure to quarantine the carts at issue, failure to contact the Commissioner of Labor and Workforce Development in writing within twenty-four (24) hours, failure to contact a qualified inspector to conduct an inspection of Goats on the Roof of the Smokies, and/or failure to cease operations until after an inspection by a qualified inspector was performed following Mrs. Cantey's collision, Defendant Alpine violated Tenn. Code Ann. § 68-121-118 and Tenn. Comp. R. & Regs. 0800-03-04-.23 and its duty to preserve evidence relevant to reasonably foreseeable litigation.

38. Defendant Alpine was required under ASTM F893 – 05a to notify Defendant Wiegand of any incident, failure, or malfunction which seriously affects the continued proper operation of Goats on the Roof of the Smokies and is information Defendant Wiegand should be aware of. If it is shown that Defendant Alpine failed to notify Defendant Wiegand of the serious incident involving Mrs. Cantey and/or other serious incidents, Defendant Alpine failed to adhere to ASTM F893 – 05a and the applicable standard of care. If Defendant Alpine did in fact notify Defendant Wiegand of serious incidents prior to Mrs. Cantey's collision, Defendant Wiegand should have known that its mountain

5

coaster posed an unreasonable risk of bodily harm to riders. In either event, Defendant Wiegand knew or should have known that its mountain coaster posed an unreasonable risk of harm to riders.

39. All of Mrs. Cantey's injuries were caused by the failure of the braking systems of the cart in which she was riding, the defective design of the ride and the release of a cart behind Mrs. Cantey before it was safe to do so.

40. Defendants owed Mrs. Cantey a duty of care to provide safety measures, such as working brake mechanisms on the Goats on the Roof of the Smokies coaster. In failing to provide adequate safety measures, Defendants failed to exercise due care and breached the duties owed to Mrs. Cantey.

41. Defendants owed Mrs. Cantey a duty of care to ensure that the brakes on the Goats on the Roof of the Smokies coasters were in working order by regularly testing and inspecting them. Upon information and belief, the Defendants breached this duty and did not properly inspect, test and/or repair the braking systems. But for the Defendants' failure to have the brakes inspected, tested, and/or repaired properly, Plaintiff would not have been injured.

42. Upon information and belief, Defendant Wiegand invented the Goats on the Roof of the Smokies coasters, including the braking system.

43. Upon information and belief, Defendant Wiegand manufactured the Goats on the Roof of the Smokies coaster, including the braking system.

44. Upon information and belief, Defendant Wiegand designed the Goats on the Roof of the Smokies coasters, including the braking system.

45. Upon information and belief, Defendant Wiegand was the seller of the Goats on the Roof of the Smokies coaster.

46. Upon information and belief, Defendant Wiegand installed and/or oversaw the installation of the Goats on the Roof of the Smokies coasters, including the braking system.

47. Upon information and belief, Defendant Alpine had sufficient input into the design and installation of the Goats on the Roof of the Smokies coasters so as to render it liable to Mrs. Cantey under Tennessee's Product Liability Statutes.

48. Upon information and belief, Defendant Wiegand utilized an automatic braking system to prevent carts from colliding with the cart in front of them. Such system was defectively designed and/or manufactured such that it failed to perform properly.

49. Defendant Alpine advertised its coaster as having a "distance control system". Defendant Alpine represented that the coaster at issue had an innovative anti-collision system. Alpine advertised that their distance control system completely prevents riders from colliding with each other.

50. Both Defendants knew at all material times that cart collisions are a known cause of serious injuries.

51. Defendant Wiegand advertised its coaster as compliant with DIN, ASTM and CSA standards, as appealing "to all ages" with "no skills … required and … fun for the entire family," and further states, "[r]ain and snow, no problem, Wiegand's excellent braking system is not effected."

52. If Defendant Alpine did utilize an "intelligent distance control assist system" on the Goats on the Roof of the Smokies coasters, the same malfunctioned.

53. Defendant Wiegand advertises that its Alpine coaster creates increased revenue over competitors. However, this is based upon a revenue model wherein coasters are dispatched at intervals that are unsafe due to the risk of collision while multiple coasters are simultaneously operating on the downhill portion of the track.

54. The overall design of the Goats on the Roof of the Smokies coaster rendered the same unreasonably dangerous and defective.

55. Upon information and belief, there are now hundreds of Wiegand mountain coasters

7

installed around the world.

56. Since the introduction of Wiegand mountain coasters, they have been responsible for numerous serious injuries. Defendants knew, or should have known, of the existence of serious injuries involving Wiegand coasters prior to November 22, 2021.

57. Defendants knew, or should have known, that an unsafe amusement device is likely to cause serious and preventable injuries to members of the public.

58. Defendant Wiegand knew, or in the alternative should have known, that the coasters it manufactured, including but not necessarily limited to the one installed at Defendant Alpine, posed a risk of collision and/or bodily injury to riders.

59. Defendant Alpine knew, or in the alternative should have known, that the coasters manufactured by Defendant Wiegand, including but not necessarily limited to the precise type installed at Defendant Alpine, posed a risk of collision and/or bodily injury to riders.

60. The Goats on the Roof coaster constituted a defective or dangerous condition about the land of Defendant Alpine which the Defendant Alpine created, and about which it had actual and/or constructive knowledge. Defendant Alpine's failure to abate this dangerous condition, or sufficiently warn regarding same, renders it liable to Mrs. Cantey in premises liability.

61. In operating the coaster at issue, Defendant Alpine owed its invitees/guests such as Mrs. Cantey a heightened duty of care that a common carrier owes. In failing to have properly operating braking systems, Defendant Alpine breached this heightened duty.

62. In operating the coaster at issue, Defendant Alpine owed its invitees and guests such as Mrs. Cantey a duty to train their employees to operate Goats on the Roof of the Smokies in a safe manner by having strict set guidelines as to how far apart each cart must be spaced in order to ensure the safety of its invitees/guests.

8

63. Defendant Alpine had a duty to its invitees/guests to have safety measures in place in the event that a cart was mistakenly released too soon behind the previous cart.

64. In operating the coaster at issue, Defendant Alpine had a duty to its invitees/guests to supervise the employees in charge of the coaster in such a way that ensured the safety of their patrons by managing the time between each cart release.

65. Defendants breached their duty by neglecting to train, supervise, or set appropriate guidelines for the operation of Goats on the Roof of the Smokies, by allowing minimally trained employees to release each cart when they deemed it was appropriate to maximize revenue.

66. Defendant Wiegand knew, or alternatively should have known, that the design of the Goats on the Roof of the Smokies coaster used therein were reasonably likely to cause bodily injury, yet Defendant Wiegand continued to market, install, and sell such defectively designed coasters and carts in the stream of commerce.

67. These Defendants are also liable to Plaintiffs based on all theories of liability (including strict liability) contained in the Tennessee Product Liability Statutes, Tenn. Code Ann. § 29-28-101, *et seq*. The Goats on the Roof of the Smokies coasters in question were negligently designed in (1) not having sufficient and operational safety systems (including brakes) to prevent a collision between carts, (2) not having a layout which enables the cart to decelerate towards the conclusion of the ride, and (3) not having sufficient safety restraint systems to prevent an injury of the type sustained by Plaintiff in the event of a collision.

68. The Goats on the Roof of the Smokies coasters in questions were in a defective condition or unreasonably dangerous at the time they left the control of the manufacturer and seller Defendant Wiegand.

69. The condition of the coaster ride in question was dangerous beyond the extent that would

9

be contemplated by an ordinary consumer. Because of the dangerous condition of the coaster ride, it is not something that would be put on the market by a reasonably prudent manufacturer or seller given knowledge of such dangerous condition.

70. The injuries sustained by Plaintiff were foreseeable as a result of the defective braking system, defective design, and an improper safety restraint system.

71. Defendants have also breached warranties both express and/or implied as well as the merchantability and fitness for a particular purpose, all of same leading to the traumatic injuries suffered by Mrs. Cantey.

72. Upon information and belief, Defendants failed to appropriately investigate, inspect, and report coaster collisions, including but not necessarily limited to the one involving Mrs. Cantey.

73. But for the misrepresentations, negligent management of loading and releasing carts, defective braking mechanism, defective design, improper or otherwise negligent maintenance and improper safety restraint system, Mrs. Cantey's serious and traumatic injury would not have occurred.

74. Defendants are liable to the Plaintiff in strict liability for placing the unreasonably and inherently dangerous coaster cart into the stream of commerce.

75. Plaintiff's injuries and resulting damages were foreseeable as a result of the misrepresentations, negligent management of loading and releasing carts, defective braking mechanism, defective design, improper or otherwise negligent maintenance and improper safety restraint system that did not allow the cart behind Mrs. Cantey's cart the ability to stop before colliding with the Mrs. Cantey's cart and upon collision, caused or contributed to the severity of the injuries she suffered.

76. Mrs. Cantey avers that each and every one of the aforementioned negligent acts of Defendants constitutes the proximate and legal cause of her damages.

77. Mrs. Cantey has suffered serious and debilitating injuries as a direct result of the failure of the collision. As a result of these injuries, Mrs. Cantey has sought medical treatment and care and has incurred substantial medical expenses as a result. Mrs. Cantey has also suffered a loss of income. She has also suffered, and will continue to suffer in the future, pain and suffering, distress and anguish, loss of enjoyment of life, disfigurement and permanent impairments and disabilities.

78. On October 1, 2011, the Tennessee Civil Justice Act went into effect, enacting "caps" in all Tennessee personal injury cases for non-economic damages. Tenn. Code Ann. § 29-39-102. Under the Act, Mrs. Cantey's non-economic damages are expected to be claimed to be capped at Seven-Hundred and Fifty-Thousand Dollars ($750,000.00) for general injuries and One-Million Dollars ($1,000,000.00) for catastrophic injuries.

79. Plaintiffs aver that Tenn. Code Ann. § 29-39-102, which places limits on non-economic damages, is in violation of Article I, Section 6 of the Tennessee Constitution, which provides that the right of trial by jury shall remain inviolate. Furthermore, the statutory cap on non-economic damages violates Article 1, Section 17 of the Tennessee Constitution which states that all courts shall be open, and every man shall have a remedy for injury done by due course of law. The non-economic statutory cap usurps the powers of the Judicial Branch in violation of Article II, Sections 1 and 2 of the Tennessee Constitution. Additionally, the statutory cap violates Article XI, Section 16, of the Tennessee Constitution which indicates that the rights of citizens articulated in Tennessee's Bill of Rights "shall never be violated on any pretense whatever . . . and shall forever remain inviolate."

80. Therefore, Mrs. Cantey requests a declaration, pursuant to Tenn. Code Ann. § 29-14-103, that the cap is void *ab initio* and of no force and effect.

81. Pursuant to Tenn. Code Ann. § 29-14-107 and Fed. R. Civ. P. 5.1(a)(2), a copy of the Complaint was served on the Attorney General of the State of Tennessee, notifying the State of

Tennessee Attorney General that Mrs. Cantey is challenging the constitutionality of Tenn. Code Ann. § 29-39-102.

82. Mr. Cantey was married to Mrs. Cantey at the time of the collision described above, and is currently married to Mrs. Cantey. As a direct and proximate result of the collision, Mr. Cantey has been caused to suffer a loss of consortium.

83. Plaintiffs demand a jury to try this cause.

**WHEREFORE**, Plaintiff, Dixie Kim Cantey, sues the Defendants for compensatory damages for the sum of Two Million ($2,000,000) Dollars, and Plaintiff, John Cantey, sues the Defendants for compensatory damages in the sum of Two Hundred and Fifty Thousand ($250,000) Dollars. Plaintiffs also pray they be awarded court costs and discretionary costs.

Respectfully submitted,

***/s/ Weldon E. Patterson, Esq.***
Weldon E. Patterson, Esq. (BPR # 13608)
Grant E. Mitchell, Esq. (BPR # 036878)
BUTLER, VINES AND BABB, P.L.L.C.
2701 Kingston Pike
Knoxville, TN 37919
wPatterson@bvblaw.com
Phone & Fax: (865) 244-3928
gMitchell@bvblaw.com
Phone & Fax: (865) 244-3945
*Attorneys for Plaintiffs*